2023 IL App (1st) 221212-U

SECOND DIVISION
October 24, 2023

No. 1-22-1212

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| CIRAS, L.L.C, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 13 CH 2248 |
| | ) | |
| WILLIAM S. BORJA, | ) | Honorable |
| | ) | Marian E. Perkins |
| Defendant-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Affirmed. Court did not err in reviving judgment or dismissing counterclaim and affirmative defenses.

¶ 2    Defendant William S. Borja appeals the circuit court's order granting plaintiff CIRAS, L.L.C's petition to revive a personal-deficiency foreclosure judgment against him. Borja challenged the revival of judgment, arguing that the 1099-A tax forms he received shortly after the foreclosure showed, or at least created a question of fact as to whether, his personal liability had been discharged or extinguished. We agree with the circuit court and CIRAS that Borja's defense is based on a fundamental misunderstanding of the effect and purpose of the 1099-A forms he received. As such, we affirm.

¶ 3                                    BACKGROUND

¶ 4     In 2014, U.S. Bank National Association (U.S. Bank), obtained judgments of foreclosure on three properties owned by Borja that secured his loan from U.S. Bank. At the judicial sale that followed the foreclosure, U.S. Bank purchased the properties. The sale of the properties did not make U.S. Bank whole; a deficiency of nearly $250,000.00 remained. The court's order confirming sale specifically stated that U.S. Bank "reserves its right to pursue a personal deficiency judgment at a later date."

¶ 5     On September 11, 2014, U.S. Bank obtained that judgment "against the Defendant William S. Borja in the amount of $247,475.30." Without attempting to collect, in December 2020, U.S. Bank assigned its judgment against Borja to CIRAS, which became the party in interest and thus the plaintiff in this lawsuit. In April 2021, CIRAS filed a combined petition to substitute itself as plaintiff and revive the September 2014 judgment.

¶ 6     Ultimately, Borjas filed a counterclaim for a declaratory judgment that he was no longer personally liable on the loan. He also filed affirmative defenses of discharge, waiver, estoppel, and abandonment. The underlying premise of both his counterclaim and each of his affirmative defenses was that U.S. Bank had discharged the debt against him.

¶ 7     Borja supported this position with three 1099-A tax forms he received from U.S. Bank in 2015. Each of these three forms are substantially identical and relate to one of the three different properties that secured the loan with U.S. Bank (and which U.S. Bank later purchased). The forms are titled "Acquisition or Abandonment of Secured Property." Each reflects that it was issued due to the "05-23-14" acquisition of the properties (meaning the judicial sales of the properties to U.S. Bank). Box 2 indicates, for each, that there was an outstanding principal balance of $42,120.00, while Box 4 shows a $63,000.00 fair market value for each of the

properties. Critical to Borja's argument, Box 5 states: "If checked, the borrower was personally liable for repayment of the debt." This box was not checked on any of the three forms.

¶ 8    Based on these tax forms, Borja had two distinct theories of defense. First, he argued that since the fair market value shown on the forms was *higher* than the principal of the loan, the sales were sufficient to extinguish his debt. Second, since Box 5 was not checked, "Mr. Borja no longer had any obligation to pay [U.S. Bank] a nickel." He claims that since there was, at least, superficial evidence of his defenses, he should be given a chance to conduct discovery before granting the petition to revive the judgment.

¶ 9    CIRAS moved to dismiss the counterclaim and strike the affirmative defenses. CIRAS attacked both the counterclaim and affirmative defenses by challenging the premise on which Borja relied. Specifically, CIRAS argued that a Form 1099-A had nothing to do with loan forgiveness and instead related solely to the "sale of the foreclosed upon properties." Citing IRS publications, CIRAS noted that these 1099-A forms merely reported gains or losses on the foreclosed properties. For cancellation of debt, CIRAS argued, an entirely different tax form applied—a Form 1099-C—which U.S. Bank never sent Borja.

¶ 10    On March 14, 2022, the circuit court entered two orders. In the first, a form order, the court granted CIRAS's petition to revive judgment. The order revived the September 2014 judgment in the amount of $393,092.88 (the increase owing primarily to seven years' worth of accrued interest). In the second order, the court did two things—it (1) noted that the petition for revival of judgment had been granted under separate order and (2) set a hearing date of April 14 for ruling on the motion to dismiss the counterclaim and to strike affirmative defenses.

¶ 11     Two days before the hearing and ruling date—that is, on April 12—Borjas filed a motion to vacate the order granting the revival of judgment. He claimed the petition for revival of judgment could not be granted without first ruling on his counterclaim and affirmative defenses.

¶ 12     The circuit court took the matter under advisement. On June 21, the court entered an order indicating that it had verbally "announced its preliminary ruling striking Mr. Borja's affirmative defenses and counterclaims with prejudice" and that the court would "provide a written ruling which shall be appealable on or before July 11, 2022." The court further indicated in the written order that it would rule on Borja's motion to vacate at a hearing on August 3, 2022.

¶ 13     What followed was somewhat confusing. The court did issue a written ruling on July 15—close to the promised deadline—and it did discuss the viability of Borja's counterclaims and affirmative defenses, finding that none of them had merit. But the court did so in the context of considering Borja's motion to vacate, not CIRAS's motion to dismiss and strike the counterclaims and affirmative defenses. In that July 15 order, the court denied Borja's motion to vacate and indicated that it would later hear argument on the motion to strike and dismiss the counterclaim and affirmative defenses.

¶ 14     It was not until September 8 that the court entered a judgment order resolving the motion to dismiss and strike. The court granted the motion, striking both the counterclaim and affirmative defenses with prejudice. For its reasoning, the court referenced its July 15 order denying the motion to vacate.

¶ 15     With the petition for revival of judgment having been granted and the counterclaim stricken with prejudice, the matter was disposed of. Borjas, who had filed an earlier notice of appeal out of an abundance of caution (and had amended it once already, again out of caution, given some of the confusion in the circuit court), sought leave of this court to amend the notice

of appeal to reflect that he was appealing both the judgment order reviving the judgment and the judgment order striking his counterclaim and affirmative defenses. This court granted that motion. This appeal followed.

¶ 16                                          ANALYSIS

¶ 17     Borja claims that he presented a sufficient defense to the petition to revive or, at a minimum, that there is a question of fact that precluded summary disposition of his claims. CIRAS responds, much as it did below, that Borja's claims are based on a fundamental misunderstanding of the 1099-A tax form.

¶ 18     Both motions—the petition to revive the judgment and the motion to dismiss and strike the counterclaims and affirmative defenses—were granted as a matter of law based on the legal insufficiency of Borja's position. The matter was decided entirely on the pleadings without an evidentiary hearing or findings of fact. For these reasons, our review is *de novo*. See *In re County Collector*, 2023 IL App (1st) 210523, ¶ 17 (*de novo* review applies when court decides issue entirely on documents); *Bouton v. Bailie*, 2014 IL App (3d) 130406, ¶ 7 (motions to dismiss are reviewed *de novo*); *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶ 39 (legal questions are reviewed *de novo*).

¶ 19     In Illinois, monetary judgments are only enforceable in 7-year increments. See 735 ILCS 5/12-108(a) (West 2022). To avoid a judgment becoming stale—that is, unenforceable—a party may seek to "revive" the judgment to renew its enforceability, up to a limit. *Id.*; see also 735 ILCS 5/2-1602 (West 2022). Inherent in the process of reviving a judgment is the assumption that the defendant is still liable for said judgment. See *First National Bank in Toledo v. Adkins*, 272 Ill. App. 3d 111, 115 (1995). The revival is not the creation of a new judgment but a continuation of the previously rendered one. *Id.* A defendant may challenge a revival of

judgment in two ways: "denial of the existence of the judgment or proof of satisfaction or discharge of the action." *Department of Public Aid ex rel. McGinnis v. McGinnis*, 268 Ill. App. 3d 123, 131 (1994).

¶ 20    It is this latter defense that Borja raises; in two different ways, he claims his debt to U.S. Bank (and now to CIRAS) has been discharged. He claims that either the debt was extinguished by the sale, or the Bank discharged his obligation. Both positions rely on Borja's interpretation of the 1099-A forms he received for the 2014 tax year from U.S. Bank. In his first argument, Borja argues that the Forms 1099-A he received indicated that his debt had been discharged.

¶ 21    Recall the salient facts: U.S. Bank, after foreclosing on the properties and forcing a judicial sale, purchased the properties at that judicial sale. It is for this reason, says CIRAS, that U.S. Bank issued the Forms 1099-A to Borjas in 2015 for the tax year 2014, when the judicial sale occurred—because federal law requires lenders like U.S. Bank to issue a 1099-A form to a borrower when it acquires an interest in property to partially satisfy the borrower's debt. That form is materially different than a Form 1099-C, CIRAS argues, which is filed with the IRS when the lender discharges the borrower's debt. U.S. Bank never sent a Form 1099-C, in other words, because it did not discharge the borrower's debt, and nothing contained in the 1099-A form could be construed as saying otherwise.

¶ 22    Our review of the law confirms CIRAS's position.

¶ 23    IRS Form 1099-A is entitled "Acquisition or Abandonment of Secured Property." 26 C.F.R. § 301.6721–1(g)(3)(vii). There is no issue of abandonment of secured property here, so we will focus on the other topic, relevant to our case—the acquisition of secured property.

¶ 24    A lender who acquires an interest in property in full or partial satisfaction of a debt must file a Form 1099-A with the government. See 26 U.S.C. § 6050J (a)(1) ("Any person who ***

lends money secured by property and who *** in full or partial satisfaction of any indebtedness, acquires an interest in any property which is security for such indebtedness *** shall make a return *** with respect to each of such acquisitions or abandonments, at such time as the Secretary may by regulations prescribe."); 26 C.F.R. § 301.6721-1(g)(3)(vii). The lender must also provide a copy of the Form 1099-A to the borrower. See 26 U.S.C. § 6050J(e).

¶ 25    To make things simpler, when we are talking about the "acquisition of secured property," we mean the purchase of foreclosed property at a judicial sale by the same lender who foreclosed on the property. That is a fairly common occurrence in foreclosure proceedings. Indeed, IRS regulations refer to section 6050J, the federal statute we just cited, as pertaining to transactions "relating to foreclosures and abandonment of property." 26 C.F.R. § 1.6050P-1(e)(3); see *id*. § 301.6721-1(g)(3)(vii) (described as "relating to foreclosures and abandonment of security").

¶ 26    The case law provides examples, as well. See *Federal National Mortgage Ass'n v. Daniels*, 517 S.W.3d 706, 715 (Tenn. App. 2015) ("Nationstar acquired an interest in the property by purchasing it at the foreclosure sale and was therefore required to provide the [borrower] with a Form 1099-A."); *CoBiz Financial v. CF Homes, L.L.C.*, 1 CA-CV 09-0711, 2010 WL 5033527 at *2 (Ariz. App. Nov. 23, 2010) ("[a] lender that acquires an interest in a secured property through foreclosure but does not cancel the borrower's remaining deficiency must file *** a Form 1099-A.").

¶ 27    And that scenario occurred here. U.S. Bank foreclosed on Borja's three properties and then purchased them at the judicial sale. Tracking the statute we just cited above, U.S. Bank "len[t] money secured by property and *** in *** partial satisfaction of *** indebtedness, acquire[d] an interest" in the "property which is security for such indebtedness." 26 U.S.C. §

6050J (a)(1). Thus, U.S. Bank was required to file a Form 1099-A, as it did, with a copy to Borja. See *id.* § 6050J(e).

¶ 28    Even so, Borja claims, U.S. Bank's failure to check Box 5 on those Forms 1099-A—"If checked, the borrower was personally liable for repayment of the debt"—means that U.S. Bank did *not* consider Borja personally liable for the debt. For several reasons, we do not agree.

¶ 29    For one, that arguments conflates Forms 1099-A and 1099-C, when they are in fact quite different.

¶ 30    IRS Form 1099-C is entitled "Cancellation of Debt." A federal statute, entitled "Returns relating to the cancellation of indebtedness by certain entities," mandates that, if an entity discharges the debt of any person in an amount greater than $600, the forgiving entity must file a Form 1099-C with the government. 26 U.S.C. § 6050P(a) (entity that "discharges (in whole or in part) the indebtedness of any person during any calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe)"); 26 C.F.R. § 1.6050P-1 ("any applicable entity *** that discharges an indebtedness of any person *** of at least $600 during a calendar year must file an information return on Form 1099-C with the Internal Revenue Service.").

¶ 31    The filing of a Form 1099-C is mandatory, not optional. As this court has noted, Form 1099-C "was created for the mandatory reporting by applicable entities to the IRS of discharges, cancellations, or extinguishments rendering a debt unenforceable or uncollectible by the creditor." *In re Estate of Hofer*, 2015 IL App (3d) 140542, ¶ 22. Indeed, "under federal law, a financial institution *** must send a copy of form 1099-C to a debtor when it discharges a debt." *Franklin Credit Management Corp. v. Nicholas*, 812 A.2d 51, 61 (Conn. App. 2002); see *CoBiz Financial*, 2010 WL 5033527 at *2 ("Federal law requires lenders that discharge a debt to report

the discharge to the IRS by filing a Form 1099-C."); *Amtrust Bank v. Fossett*, 224 P.3d 935, 936

(Ariz. App. 2009) ("Under federal law, a lender that 'discharges' a debt must report the

discharge to the Internal Revenue Service").

¶ 32    Though not directly relevant to our discussion, for the sake of accuracy and

completeness, we should note that various events will trigger the mandatory reporting of a Form

1099-C, some of which are *not* actual discharges of debt. See, *e.g.*, *Hofer*, 2015 IL App (3d)

140542, ¶¶ 26-27; *F.D.I.C. v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *Kelly v. Wolpoff &*

*Abramson, L.L.P.*, 634 F. Supp. 2d 1202, 1209, 1211 (D. Colo. 2008); 26 C.F.R. § 1.6050P-

1(b)(2)(A)-(G) (listing triggering events that mandate reporting of Form 1099-C). So the filing of

a Form 1099-C will not automatically mean that an actual discharge of debt has occurred.

¶ 33    But the converse is absolutely true: If, in fact, an entity *has* discharged its debt, as Borja

claims U.S. Bank did here, the discharging entity is *required* to file a 1099-C. *Nicholas*, 812

A.2d at 61; *CoBiz Financial*, 2010 WL 5033527 at *2; *Fossett*, 224 P.3d at 936. So while the

receipt of a 1099-C will not automatically inform a borrower that his debt has been discharged,

the borrower can be absolutely certain of this: if he does *not* receive a 1099-C, his debt has *not*

been discharged.

¶ 34    The reason the filing is mandatory is that the cancellation of debt comes with tax

consequences for both the forgiving entity and the debtor. The forgiving entity may be entitled to

declare a loss on its tax returns. More to the point, the cancelled debt "becomes taxable income

to the debtor." *In re Reed*, 492 B.R. 261, 273 (Bankr. E.D. Tenn. 2013); see 26 U.S.C. §

61(a)(12) (2002) ("income for discharge of indebtedness" is included within gross income). "The

copy of the Form 1099-C a lender provides to the borrower 'informs the debtor of the amount of

the debt that has been discharged and that the debtor must generally report the discharged

amount as income on his federal income tax return.' " *Fossett*, 224 P.3d at 936 (quoting

*Nicholas*, 812 A.2d at 61). Likewise, the requirement that a lender report the debt it has

discharged allows the IRS "to compare the amount of discharged debt reported by various

institutions with the amount of discharged debt reported by individuals." *Debt Buyers' Ass'n v.*

*Snow,* 481 F.Supp.2d 1, 5 (D.D.C. 2006).

¶ 35    Unlike Forms 1099-A, which only applies in the context of secured property that is either

re-purchased by the foreclosing lender or (not applicable here) abandoned, Form 1099-C covers

any cancellation of debt, not limited to loans to purchase a home or even secured loans generally.

For example, an overdue retail loan in which the lender decides to discontinue collection

proceedings. See, *e.g.*, *Kelly*, 634 F. Supp. 2d 1202, 1209, 1211; *In re Zilka,* 407 B.R. 684, 689

(Bankr. W.D.Pa. 2009); 26 C.F.R. § 1.6050P-1(b)(2)(G). Or an ordinary loan to a business or

farmer. See *Hofer*, 2015 IL App (3d) 140542, ¶¶ 3-5.

¶ 36    But there is, of course, an area of overlap between the events that trigger the filing of a

Form 1099-A and those that trigger a Form 1099-C filing. A lender may foreclose on a property,

purchase it at the judicial sale, but discharge the borrower's remaining delinquency—precisely

what Borja claims happened here. The law is clear in that instance, however, that *the Form 1099-*

*C must still be filed*, regardless of whether the lender also chooses to file a Form 1099-A.

Specifically, the IRS regulation governing the reporting of Forms 1099-C (under 26 U.S.C. §

6050P) explains that the Form 1099-C will suffice even if a Form 1099-A (under 26 U.S.C. §

6050J) would otherwise also be required:

> "**Coordination with reporting under section 6050J.** If, in the same calendar year, a
>
> discharge of indebtedness reportable under section 6050P occurs in connection with a
>
> transaction also reportable under section 6050J (relating to foreclosures and

abandonments of secured property), an applicable entity need not file both a Form 1099-A and a Form 1099-C with respect to the same debtor. The filing requirements of section 6050J will be satisfied with respect to a borrower if, in lieu of filing Form 1099-A, a Form 1099-C is filed in accordance with the instructions for the filing of that form." 26 C.F.R. § 1.6050P-1(e)(3).

¶ 37    The IRS has published information explaining that federal regulation in various documents of which we may take judicial notice. See *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 44 (court may judicially notice information available on public websites). For example, in Publication 4681, titled "Cancelled Debts, Repossessions, Foreclosures and Abandonments (for individuals)," the IRS explains:

"A lender who acquires an interest in your property in a foreclosure or repossession should send you Form 1099-A, Acquisition or Abandonment of Secured Property, showing information you need to figure your gain or loss. *However, if the lender also cancels part of your debt and must file Form 1099-C, the lender can include the information about the foreclosure or repossession on that form instead of on Form 1099-A. The lender must file Form 1099-C and send you a copy if the amount of debt canceled is $600 or more and the lender is a financial institution*, credit union, federal government agency, or other applicable entity, as discussed earlier in chapter 1." (Emphasis added.)[1]

¶ 38    Likewise, in its "Instructions for Forms 1099-A and 1099-C," the IRS makes this point twice, once in its specific instructions for Form 1099-A and again regarding Form 1099-C:

---

[1] Internal Revenue Service, "Cancelled Debts, Repossessions, Foreclosures and Abandonments (for individuals)," I.R.S. Publ. 4681, Cat. No. 5158F (Oct. 27, 2022), pp. 13-14; https://www.irs.gov/pub/irs-pdf/i1099ac.pdf. (site last visited October 3, 2023).

"If, in the same calendar year, you cancel a debt of $600 or more in connection with a foreclosure or abandonment of secured property, it is not necessary to file both Form 1099-A and Form 1099-C, Cancellation of Debt, for the same debtor. *You may file Form 1099-C only.* You will meet your Form 1099-A filing requirement for the debtor by completing boxes 4, 5, and 7 on Form 1099-C." (Emphasis added.)[2]

¶ 39     All of which is to say that, under any circumstances, if U.S. Bank had discharged Borja's debt, as he claims, U.S. Bank would have been required to file a 1099-C and send a copy to him. The law does not and did not permit U.S. Bank to file, instead, a Form 1099-A to disclose a cancellation of debt.

¶ 40     Still, says Borja, there is that Box 5 on the Forms 1099-A he received for the three foreclosed properties, which reads: "If checked, the debtor was personally liable for repayment of the debt." That box was not checked. So it would have been reasonable, says Borja, for him to assume that U.S. Bank had cancelled his remaining deficiency.

¶ 41     Based on everything we have said above, facing the same facts as the ones before us, a Tennessee appellate court held that a borrower could not reasonably construe anything received from a Form 1099-A as evidence, *prima facie* or otherwise, that his lender cancelled the remaining deficiency debt on his mortgage. See *Daniels*, 518 S.W. 3d 706. The defendant there argued that the 1099-A form he received could lead him to reasonably conclude that his mortgage debt was discharged by his lender, Nationstar. *Id.* at 715. The court rejected that argument because, "by its very definition, a Form 1099-A does not reflect that Nationstar or any of its successors in interest forgave the debt owed under the promissory note prior to foreclosure

_____

[2] Internal Revenue Service, "Instructions for Forms 1099-A and 1099-C" (revised Jan. 2022), pp. 1, 3; https://www.irs.gov/pub/irs-pdf/i1099ac.pdf. (site last visited October 6, 2023).

sale; rather, it only reflects that Nationstar acquired an interest in the property at the foreclosure sale." *Id*. Thus, "no reasonable person could conclude that the Form 1099-As are evidence that Mr. Daniels's debt under the promissory note was forgiven." *Id*.

¶ 42     We agree with the reasoning in *Daniels* and could stop there. But we would add some other observations. One is that an error on the Form 1099-A cannot transform the essential character of the form into something it is not. Form 1099-A in no way purports to do anything other than inform the IRS (with a copy to the borrower) that a lender foreclosed on property and later acquired that property at a judicial sale. (Putting aside abandonments, not relevant here.)

¶ 43     This was a point made in *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 305 (1st Cir. 2016), where the opposite thing happened compared to this case—the lender mistakenly *checked* Box 5, indicating that the plaintiff *was* personally liable for the debt. *Id*. at 302. In fact, the plaintiff was not personally liable; the debt had been previously discharged in bankruptcy. *Id*. The plaintiffs claimed that the 1099-A form showed that defendants were improperly attempting to collect a discharged debt in violation of bankruptcy law. *Id*. at 303.

¶ 44     The court rejected that claim because the 1099-A simply indicated that the recipient may have reportable income or loss. *Id*. at 304. In the court's words, "The 1099-A Forms state that they provide 'tax information' and that, because of the foreclosure, '[y]ou may have reportable income or loss.' *** [T]he 1099-A Forms state the outstanding principal balance as of the date of foreclosure, but they do not indicate that the [borrowers] owe any money to anyone—not taxes to the IRS, and not the discharged debt to [the lenders]." *Id*. at 304-05. The fact that the lender "may have incorrectly checked the box showing that 'the borrower was personally liable for repayment of the debt' does not change this analysis." *Id*. at 305.

¶ 45     To that we would add that the information provided to Borja, along with the Form 1099-A itself, reveals that the information with which Box 5 is concerned (whether the borrower was personally liable for repayment of the debt) is not relevant to "acquisitions" of secured property—that is, purchases at judicial sales after foreclosures. Rather, in its "Instructions to Borrower" included with the form, the IRS explains that this information is relevant to *abandonments* of secured property (the other topic covered by Form 1099-A, aside from post-foreclosure purchases):

> "You may have reportable income or loss because of such acquisition or abandonment. Gain or loss from an *acquisition* is generally measured by the difference between your adjusted basis in the property and the amount of your debt canceled in exchange for the property or, if greater, the sale proceeds. If you *abandoned* the property, you may have income from the discharge of indebtedness in the amount of the unpaid balance of your canceled debt. *The tax consequences of abandoning property depend on whether or not you were personally liable for the debt.*" (Emphasis added.)[3]

¶ 46     So if Borja was at all confused by the non-checking of Box 5, the instructions included with his copies of the Forms 1099-A would have explained the relevance of that information.

¶ 47     At bottom, the question here, the one Borja raises, is whether his receipt of the Forms 1099-A either show proof that his remaining deficiency debt of over $247,000 was discharged or at least creates a question of fact sufficient to warrant an evidentiary hearing of some kind. Based on everything we have said above, the answer is clearly no.

---

[3] Internal Revenue Service, Form 1099-A (rev. Jan. 2022), "Instructions for Borrower;" https://www.irs.gov/pub/irs-pdf/f1099a.pdf#:~:text=If%20you%20abandoned%20the%20property%2C%20you%20may%20have,property%20held%20for%20personal%20use%20are%20not%20deductible. (site last visited Oct. 7, 2023).

¶ 48    We are not persuaded by Borja's citation to our decision in *Hofer*, 2015 IL App (3d) 140542, which is obviously distinguishable. There, we held that the Form 1099-C the borrower received, though not conclusive evidence that his debt had been discharged, was at least competent evidence to create a question of material fact sufficient to avoid summary judgment. *Id*. ¶¶ 20-22, 34. But that case, of course, involved a Form 1099-C. Borja never received a Form 1099-C; he only received a Form 1099-A. *Hofer* is no help to him.

¶ 49    Borja makes one other argument based on the face of the 1099-A form that we will briefly address, though it is hard to accept as a sincere argument. He points first to Box 2 on the form, labeled "Balance of principal outstanding." That amount, for each of the three foreclosed properties, is listed as "42,120.00." Then he points to Box 4, "Fair market value of property." That amount, for each property, is listed as "63,000." From that, Borja argues that there is no longer an outstanding debt—each property is worth more than he owes. Collectively, the three properties are worth $189,000, but he only owes $126,360 on them.

¶ 50    That argument, of course, conveniently ignores the *interest* owed on the loans, much less the court costs associated with the foreclosure litigation. Box 2 only asks for the outstanding *principal*. And indeed, if the language in Box 2 were not clear enough, the IRS specifically instructs the lender to "[i]nclude only unpaid principal on the original debt. Do not include accrued interest or foreclosure costs." IRS, Instructions for Forms 1099-A and 1099-C, (revised Jan. 2022), https://www.irs.gov/pub/irs-pdf/i1099ac.pdf. (site last visited October 3, 2023). And the borrower is told that Box 2 "[s]hows the debt (*principal only*) owed to the lender on the loan when the interest in the property was acquired by the lender or on the date the lender first knew or had reason to know that the property was abandoned." (Emphasis added.) *Id.*

¶ 51    In sum, as a matter of law, the filing of the Forms 1099-A did not signify to the IRS that U.S. Bank had discharged Borja's debt of over $247,000. That form was not proof of any kind of a debt cancellation, and no evidentiary hearing was required to make that legal conclusion. We likewise agree with the court in *Daniels* that Borja could not have reasonably made such an assumption.

¶ 52    In conclusion, it is not lost on us that tax forms are difficult to decipher for the layperson; they can be difficult for judges as well. This outcome may feel harsh to Borja. But if he truly believed that the non-checking of that box meant that he was suddenly, without notice, free and clear of all debt owed to U.S. Bank—despite the fact that the form, on its face, had nothing to do with the cancellation of debt, and in spite of the fact that U.S. Bank had obtained a judgment against him for over $247,000 just a few months earlier—one would think that Borja would have undertaken *some* further inquiry. If not consultation with a tax expert or a lawyer, at least a perusal of the many IRS publications online that we have cited in this order, not to mention the instructions that accompanied the Forms 1099-A he received. Any such inquiry would have led him to understand that any initial impression he may have had was mistaken. The law simply does not support his position.

¶ 53    As Borja's incorrect position underlies both his counterclaim and affirmative defenses, those pleadings were properly stricken and dismissed as a matter of law. For the same reasons, the court correctly granted the petition for revival of judgment on the pleadings alone, without an evidentiary hearing. We uphold the circuit court's judgment.

¶ 54                                    CONCLUSION

¶ 55    The judgment of the circuit court is affirmed.

¶ 56    Affirmed.